UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Spencer Ung,

        Plaintiff,

v.

Universal Acceptance Corporation,

        Defendant.

Civ. No. 15-127 (RHK/FLN)
**MEMORANDUM OPINION AND ORDER**

---

Michael S. Hilicki, Keith J. Keogh, Keogh Law, Ltd., Chicago, Illinois, Peter F. Barry, Patrick J. Helwig, Barry & Helwig, LLC, Minneapolis, Minnesota, for Plaintiff.

David L. Hartsell, Sarah A. Zielinski, McGuireWoods LLP, Chicago, Illinois, Burt M. Rublin, Philip N. Yannella, Daniel JT McKenna, Ballard Spahr LLP, Philadelphia, Pennsylvania, Patrick C. Summers, DeWitt, Mackall, Crounse & Moore, S.C., Minneapolis, Minnesota, for Defendant.

---

In this action, Plaintiff Spencer Ung alleges that Defendant Universal Acceptance Corporation ("Universal") made unauthorized calls to his cell phone, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* Presently before the Court is Universal's Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion.

**BACKGROUND**

On the surface, this is (and should be) a relatively straightforward case; indeed, the events giving rise to the action are undisputed. As is often the case, however, things are not quite as simple as they might seem.

Universal is the financing arm of Interstate Auto Group, Inc., d/b/a CarHop ("CarHop"), an Edina, Minnesota company that sells used cars nationwide to people with poor or no credit.  A person interested in buying a CarHop vehicle must submit a financing application listing credit references and the name of the buyer's landlord.  This provides Universal with contact information for persons who could pass along messages if the buyer were to fall behind on the vehicle's payments.

Ung was one such individual whose contact information was provided by a car buyer.  In 2013, Joseph Holley purchased a Kia Sorrento from a CarHop location in Crystal, Minnesota; he provided Ung's name and cell-phone number, listing Ung as his landlord.  Holley eventually fell behind on the Kia's payments and Universal began placing calls to Ung.  It is undisputed that between June and October 2014, Universal called him twelve times on his cell phone.  Ung alleges that each of these calls was placed without his consent and, accordingly, violated the TCPA.

The foregoing is, in essence, the entire crux of this case.  But against this simple backdrop, the parties have attempted to drag the Court down a rabbit hole, raising complex arguments about the intricacies and capabilities of the telephone system Universal used to call Ung.[1]  This, according to the parties, is because the TCPA only prohibits calls made using an "*automatic telephone dialing system* [ATDS] . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C.

---

[1] The parties' arguments and blizzard of briefing remind the Court of Alice, having passed through the looking glass, exclaiming, "It seems very pretty . . . but it's rather hard to understand!  . . . Somehow it seems to fill my head with ideas – only I don't know exactly what they are!"  Lewis Carroll, Through the Looking Glass, ch. 1.

§ 227(b)(1)(A)(iii) (emphasis added).  The statute defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  § 227(a)(1).  The parties' entire dispute, therefore, has devolved into a question about the phone system on which Universal called Ung's cell phone:  Ung contends that it qualifies as an ATDS, while Universal contends it does not.  The parties have submitted nearly 100 pages of briefs – and a small mountain of documents – addressing the intricacies and capabilities of Universal's telephone system, and having pored over those submissions, the Court concludes that no genuine issue of fact exists, as set forth below.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of Ung, there is no genuine issue as to any material fact and Universal is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  Universal bears the burden of showing the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to Ung.  Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  Ung may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

Finding computerized telephone calls to be the "scourge of modern civilization," 137 Cong. Rec. 30821 (1991) (statement of Sen. Hollings), Congress enacted the TCPA in 1991 in an attempt to end "the proliferation of intrusive, nuisance calls to [consumers'] homes from telemarketers." 105 Stat. 2394 (Dec. 20, 1991), note following 47 U.S.C. § 227. As noted above, the statute bans, among other things, telephone calls to cell phones made using an ATDS, that is, "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

According to the Federal Communications Commission ("FCC") – which is tasked with enacting regulations to implement the TCPA, 47 U.S.C. § 227(b)(2) – the hallmark of an ATDS is the ability to dial numbers without human involvement. As early as 2003, the FCC recognized that the "basic function" of an ATDS is "the capacity to dial numbers without human intervention." In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14,014, 14,091-92 (July 3, 2003) (emphasis deleted). The FCC has never wavered from this "human intervention" requirement, repeatedly reiterating that the capacity to independently place calls without the involvement of a live person remains central to determining whether telephony qualifies as an ATDS. See In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991, 23 FCC Rcd. 559, 566 (Jan. 4, 2008) (reiterating that basic function of ATDS is "to dial numbers without human intervention"); In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15,391, 15,392 n.5 (Nov. 29, 2012) ("The

Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.") (emphasis deleted); <u>In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991</u>, 30 FCC Rcd. 7961, 7975 (July 10, 2015) ("[T]he Commission has . . . long held that the basic functions of an autodialer are to dial numbers without human intervention and to dial thousands of numbers in a short period of time.") (internal quotation marks omitted).

There are two key reasons for this. First, the FCC's interpretation hews to the TCPA's text, which requires that an ATDS have the "capacity" to "*dial*" telephone numbers. 47 U.S.C. § 227(a)(1) (emphasis added). Without the capacity to dial on its own, telephone equipment simply cannot be an ATDS. Second, the FCC's interpretation hews to the *purpose* behind the TCPA, which was aimed at slowing (if not stopping) the rapid increase in telemarketing calls. Computerized dialers obviously are able to place substantially greater volumes of calls than individuals manually dialing phone numbers, and hence the FCC reasonably determined that manually dialed calls fell beyond the TCPA's ambit.

The FCC's understanding of this "basic function" of an ATDS proves critical in this case, because there is no genuine issue here that Universal's calls to Ung – and every other landlord whose contact information was provided by a CarHop customer – required human intervention. The record reveals that Universal stored contact information for landlords in its customer management database, known as "DRIVE." (<u>See</u> Volk Decl.

- 5 -

¶ 27; Volk Dep. at 40; Reply Mem. Ex. D.)  The record further reveals that Universal employees could only call individuals entered into DRIVE's "landlord" field by (1) manually entering a telephone number on a handset telephone (a "hard phone") on the employee's desk or (2) using a computer web application that required copying and pasting (or manually typing) the landlord's phone number from DRIVE into the application, which would then dial the number and connect the call to the employee's hard phone.  (Volk Decl. ¶¶ 30-33; Volk Dep. at 121-22; Streiff Decl. ¶ 14.)  In other words, a live human being was required to place calls to landlords such as Ung.  This is not, to parrot the FCC, a system providing a way to "dial thousands of numbers in a short period of time."  In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. at 7975.  Accordingly, Ung was not called using an ATDS.  See, e.g., Smith v. Stellar Recovery, Inc., No. 2:15-cv-11717, 2017 WL 955128, at *3 (E.D. Mich. Mar. 13, 2017) (granting summary judgment to defendant where its calling system was "characterized by one key factor that separates it from autodialers: it requires human intervention . . . to launch an outgoing call"); Pozo v. Stellar Recovery Collection Agency, Inc., No. 8:15-cv-929, 2016 WL 7851415, at *3 (M.D. Fla. Sept. 2, 2016) ("Dialing systems which require an agent to manually initiate calls do not qualify as autodialers under the TCPA.") (collecting cases); Luna v. Shac, LLC, 122 F. Supp. 3d 936, 940 (N.D. Cal. 2015) ("[T]he capacity to dial numbers without human intervention is required for TCPA liability."); Smith v. Securus Techs., Inc., 120 F. Supp. 3d 976, 985 (D. Minn. 2015) (Nelson, J.) (dismissing TCPA claim "because Securus's technology

does not even have the capacity to dial numbers without human intervention") (internal quotation marks and citation omitted).

Ung responds that human intervention is irrelevant to whether Universal's telephone equipment qualifies as an ATDS. In support, he notes that in a July 2015 Order, the FCC declined to "adopt a 'human intervention' test" for whether telephony qualifies as an ATDS. In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. at 7976. But contrary to Ung's assertion, this does not render human intervention irrelevant to the inquiry. Rather, the FCC's 2015 Order simply made clear that there are no bright-line rules for determining when calling equipment is an ATDS, and human intervention remains a factor – a key one – to be considered in the analysis. This is precisely why the 2015 Order also provides that "[h]ow the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination." Id. at 7975. If Ung were correct that human intervention plays no part in the discussion, the FCC would not have mentioned it as part of a "case-by-case determination" of whether equipment qualifies as an ATDS. Nor would it have reiterated in the 2015 Order its "long held" belief that "the basic functions of an autodialer are to dial numbers without human intervention and to dial thousands of numbers in a short period of time." Id. (internal

quotation marks omitted). While perhaps not dispositive on its own, human intervention is a critical component of the inquiry.[2]

Ung next argues that even if human intervention bears on the inquiry, summary judgment is still inappropriate because Universal has the facts wrong. He contends that his contact information was stored in the DRIVE system in a *reference* field and not a *landlord* field, citing certain of Universal's discovery responses. (Mem. in Opp'n at 18.) And building on this argument, he contends that *references* were called using Universal's "ShoreTel Enterprise Contact Center" telephone system, referred to by the parties as the "ECC," which he argues at length is an ATDS. But there are several problems with these contentions.

First, to support his argument that he was listed as a reference and not a landlord in DRIVE, Ung cites Universal's response to a discovery request asking the company to admit it contacted him "because [he] was listed as a reference by a debtor from whom [Universal] was attempting to collect a debt." (Mem. in Opp'n Ex. 5 ¶ 3.) To be sure, Universal admitted that was the *reason* it contacted Ung. (Id.) But as the company points out, this says nothing about the *method* by which he was contacted or the manner in which it *stored* Ung's information. Indeed, the fact that Holley listed Ung as a reference does not mean the company stored his information in the reference portion of the DRIVE system. Rather, the record clearly demonstrates that Ung's information was stored in DRIVE in a *landlord* data field, not a reference data field. (See Volk Decl.

---

[2] Notably, Ung's own Complaint alleges that an ATDS is "equipment that has the capacity to dial numbers *without human intervention*." (Compl. ¶ 12 (emphasis added).)

¶ 37; see also Reply Mem. Ex. D (screenshots showing Ung's information was stored in data field "LL," presumably standing for landlord).)

This also lays bare the second problem with Ung's argument. He claims Universal "admitted" it called him using the ECC, relying upon the company's response to an interrogatory. (Mem. in Opp'n at 18.) That interrogatory, however, asked the company to identify the means by which it had called *every* cell phone over a four-year period – whether for a customer, a reference, or a landlord – and it is undisputed that the ECC was used to call *customers* of Universal. (Mem. in Opp'n Ex. 7 ¶ 2.) In other words, the fact that Universal identified the ECC in response to this interrogatory does not mean it "called [Ung] using the ShoreTel ECC dialer," as he contends. (Mem. in Opp'n at 18.)[3]

Ung next argues that even if landlords were called using only "hard phones" or the web application, these were components of the ECC and, hence, were part of an ATDS. (Id.) But the unrebutted evidence in the record indicates that the ECC was a separate system used primarily for inbound phone calls, and although it could be configured to dial outbound calls, no calls placed to *landlords* via hard phones or the web application utilized this functionality (or *could* use this functionality) of the ECC. (Streiff Decl. ¶¶ 7, 11-16; Volk Decl. ¶ 37.) The only evidence cited by Ung to argue the contrary is the deposition testimony of a former Universal employee, Anna Marie Day. Day testified

---

[3] Ung similarly distorts the record when claiming Universal produced ECC system manuals in response to a discovery request asking for documents "regarding the telephone and communications system(s) used to place telephone calls to Spencer Ung." (Mem. in Opp'n at 15 (quoting id. Ex. 8 ¶ 3).) In fact, Ung truncated the full text of this discovery request, which asked for documents regarding systems used to contact not only Ung, but also *any other person called on his or her cell phone* by Universal from January 2011 to February 2015. (See Mem. in Opp'n Ex. 8 ¶ 3.)

that four or five times during her employment, she was routed a call that had been pre-dialed and was ringing on the other end when she picked up her handset.  (Day Dep. at 72-73, 78.)  But Day could not say how those calls were initiated – that is, whether they had been dialed manually by someone else or were dialed by the ECC.  (Day Dep. at 74.)  More importantly, she acknowledged that the persons called were *customers* and not *landlords* (see id. at 72, 80), and as already noted, it is undisputed the ECC was used to contact Universal's customers.  Hence, it is not surprising that Day may have participated in autodialed calls, but this does not suggest the calls placed to Ung were autodialed or that the system used to call him and other landlords had the capacity to do so.  Simply put, Ung offers no compelling evidence to undermine the statement of ShoreTel employee Peter Streiff, who avers that the web application and hard phones "are separate and independent from the ECC [and] do not communicate or connect to the ECC . . . in any way."  (Streiff Decl. ¶ 15.)[4]

Ung also makes much of the fact that in its 2015 Order, the FCC recognized that a telephone system may have the "capacity" to autodial calls even if not presently being used for that purpose.  (Mem. in Opp'n at 6-7 (citing authority for the proposition that the "capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities").)  Yet, by this logic, almost *any* telephone equipment could be

---

[4] Indeed, this fact renders largely irrelevant much of Ung's brief, which is devoted to arguing that the ECC is an ATDS because it can be configured to autodial calls.  Whatever truth there may be to that assertion, the evidence shows the ECC was not used to call landlords such as Ung; rather, those calls were manually dialed through separate functionality, namely, either hard phones or the web application.

considered an ATDS.  It does not take a creative mind to envision a 1960s-era rotary phone attached to modern computer equipment, rendering the rotary phone capable of dialing telephone numbers, but no one would suggest a rotary phone is an ATDS because of this "potential functionality."  Indeed, the FCC cited this very example in its 2015 Order when cautioning against stretching the definition of an ATDS too far.[5]  Regardless, here the record discloses that while the *ECC* can be configured to autodial, the hard phones and the web application simply cannot be.  (Streiff Decl. ¶¶ 14-16 (noting that the web application and the hard phones are "separate and independent" from the ECC and "require human intervention to initiate a phone call").)  And it is not genuinely disputed that only the hard phones and web application are used to call landlords.  Given the need to manually dial a call and the inability to place large numbers of calls in a short period of time, the Court simply does not believe there is a genuine issue that the telephone system used to call Ung qualifies as an ATDS.

---

[5] See In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. at 7975 ("We . . . acknowledge that there are outer limits to the capacity of equipment to be an autodialer[, and] the outer contours of the definition of 'autodialer' do not extend to every piece of malleable and modifiable dialing equipment that conceivably could be considered to have some capacity, however small, to store and dial telephone numbers – otherwise, a handset with the mere addition of a speed dial button would be an autodialer.  Further, although the Commission has found that a piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of 'autodialer' even if, for example, it requires the addition of software to actually perform the functions described in the definition, there must be more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer' definition.  Thus, for example, it might be theoretically possible to modify a rotary-dial phone to such an extreme that it would satisfy the definition of 'autodialer,' but such a possibility is too attenuated for us to find that a rotary-dial phone has the requisite 'capacity' and therefore is an autodialer.").

## CONCLUSION

What started as a simple case more than two years ago has now wended its way through more than 200 docket entries, including several Motions to Dismiss, a failed mediation, a Motion for Class Certification, and the instant Motion for Summary Judgment. In the Court's view, it is now time for this case's journey to come to an end. Because the evidence does not suggest Ung was called using an ATDS, his TCPA claim fails as a matter of law, and Universal is entitled to summary judgment.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Universal's Motion for Summary Judgment (Doc. No. 194) is **GRANTED**, and Ung's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: April 6, 2017                                s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge